Let's wait a minute and just let everyone get settled. Okay, Mr. Sanford. May it please the Court, Counsel, the right to trial by jury shall be preserved and no fact tried by a jury shall be otherwise reexamined by any court of the United States than according to the rules of common law. That's the Seventh Amendment. My understanding is at the time of the Seventh Amendment, the common law didn't allow for directed verdicts or judgments notwithstanding the law, only new trials. Now, I understand that Rule 50 is constitutional, but the reason I talk about that is to urge this Court in considering the case to keep its heart and mind connected to the founding principles of our founding fathers. The genius of the jury trial is that it's a committee of the community that brings together all kinds of people from all walks of life who have different opinions, maybe opposite opinions, to decide on justice. And those people will preserve unity, prevent civil unrest, and do the most good for our country potentially in the civil arena. And that's what happened here. Something very good happened here. And I say this because we shouldn't be fighting against juries. We should be encouraging and supporting juries as part of good governance in our country. Now, in this case, we had evidence of discrimination and retaliation. The strongest evidence was a tape recording by HR saying, don't lay off white people. Now, the trial judge says, well, that's not direct evidence, so it's no evidence. But that's not the law. It's still some evidence. And we had plenty of other evidence, which included not only the totality of the circumstances, but we always use McDonnell Douglas as a baseline. And the court says, well, McDonnell Douglas just doesn't apply at trial. But that's not correct. Supreme Court in Reeves says the fact finder may rely on McDonnell Douglas as proof. Now, of course, it's not the only proof. You don't have to have it to prove your case. Once you get to trial, you look at the mosaic, the totality of the play, all of the emotion, all of the facts at trial, the color, not the black and white, to prove your case. But nevertheless, you can rely on McDonnell Douglas as proof. Again, it's right there in Reeves. And we did that. You know, we proved they were black, they were qualified, they were treated adversely compared to others, and that the reasons they gave were not believable. The jury saw that. It's the same thing for retaliation. You have the proximity and pretext. We did that. I would also talk about the summary judgment standard. We did. There is no really dispute, I think, in the summary judgment. I think the opposing counsel has agreed that because of Hamilton and Muldrow, that summary judgment should go back because the wrong standard was applied. I will . . . That's on the constructive discharge. That's on the constructive discharge. We would still argue for the discrimination as well. So why don't you, just to get your argument started, so . . . You've told us that the tape recording from HR was your strongest evidence. That's what I wrote down that you said. Why don't you just muster for us what you think the other . . . your strongest other evidence is that's in this record? Yes. Not what you might ultimately prove, but what we would find in the record. What you would find is testimony and documents that would show that they had disparate work assignments, disparate seat assignments, disparate surveillance, disparate dress and attire requirements, disparate cell phone use, disparate breaks, disparate resting allowance, disparate discipline, disparate dishwashing, disparate overtime, disparate promotion, disparate demotion, disparate termination, disparate rehire. All in the record. What was the nature? Were these just allegations in the pleadings or were these depositions or interrogatories? What were they? For summary judgment purposes, they were depositions and declarations. At trial, it was testimonies and documents. It was plenary. It was full. Was it testimony just by the plaintiffs or by others in the workplace? It was by others in the workplace, including the defendant's own testimony, including HR, who agreed that if this was true and that there was disparate treatment in work assignments, seat assignments, all these things, that those would be signs or red flags of discrimination. And that if you had several, I think maybe, I think he said maybe seven, that would be enough to have a deep concern that there actually was discrimination. Well, we showed more than that. So and that's another thing I think that this court and the Supreme Court is going to be grappling with is if you don't just need McDonnell Douglas, what other standard could you have? One standard is are there enough signs of discrimination? You know, if there are enough signs and red flags of discrimination, then it's discrimination. More likely than not. How many pieces of a puzzle do you need to see before you know it's a tiger? So that should be, and that was there, too, in addition to McDonnell Douglas. I mean, you say that just to dispel any suggestion that there were only stray or sporadic evidence, but that you can use. Right. It wasn't just stray or sporadic. We even had testimony that there was racial comments. I don't think we had exactly what they were, but we even had that. So we had two weeks of trial, and we could even put on more, but the judge says, I'm not going to let you put on me, too. I'm not going to let you put on the plaintiffs who were dismissed on summary judgment to testify because it would have been cumulative. Part of me thinks, well, okay, we did have enough, but on the other hand, if he didn't think we had enough, well, we had more that we could put on. So there was more than enough. I will address, too, also the integrated enterprise for slash network, which was really CSS all along. It was always CSS, CSS, CSS, and we kind of made a compromise at trial that we would just call CSS slash work, which was a subsidiary. There is an issue there on integrated enterprise. The judge came down to say, well, the parent company out of India, which controlled everything and was the problem, importing its cash system into a U.S. company, the judge says, well, if they were not directly involved in the decision-making, then it can't be integrated enterprise. But I don't think that's the law. It's whether or not there was central control. And the parent company, they admitted they placed their own executive employee into the company, and HR, vice president, admitted that she had direct contact and direct line of reporting back to India in the company. And that should be enough for central control, or at least for a jury to decide. So we do think that should be there. Another thing that I think we're going to hope . . . What specifically was the jury asked to decide as to that issue? Nothing at all, because the judge dismissed it on Rule 50A judgment, notwithstanding the verdict. No, I'm sorry, directed verdict. It was dismissed. So they didn't get to decide. I want to take this opportunity, because I know that the landscape is new with Muldrow, and I think where the court's going with McDonnell Douglas. With Muldrow, there is a standard now, obviously, and with Hamilton, is not ultimate decision, but it is some harm. And so you have to decide what is some harm now. And the fear . . . Hamilton sort of worked a sea change, didn't it? It did. Huge. And then the Supreme Court followed suit in Muldrow. Nobody saw that coming, I believe. Yeah. Yeah. It was a long time coming, but it was a sea change, and of course it happened after this court's decision. I'm sorry, after the trial court's decision, which is why it needs to change. But now you're going to have to decide what the new standard is based on some harm. And I would, again, point you back to the Constitution with concrete example of some harm is $20 back in the Seventh Amendment itself. So some harm would be something more than a scintilla, and what's a scintilla is something very small. So almost everything should be decided by a jury. The other thing that we have in this case, though, is the size of the verdict. So they awarded $3 million in compensatory and $4 million in period of damage for each, which is . . . you know, juries truly are the best to decide the economic realities of what is here today. We have almost 800 billionaires in the United States. A million dollars for compensation for emotional distress is not that high. Now, it might have been 20 years ago, certainly 40 years ago. Today, justice is measured the same way we measure in commerce, and in commerce there is huge amounts of value that's there. And who's to say that juries are not, based on our Constitution, the best to decide those kinds of values? Are they? Are . . . And you've made your point. I made that point. On the importance of juries. Yes. And I don't know what other points you wanted to cover, but it seems to me that it would be most useful for you to use your remaining time to get back to my earlier question . . .  . . . to point out for us what you believe is the most damaging evidence, and specifically who said what about what had happened in the workplace, so that we can . . . Okay. That's one of the benefits of oral argument, is to engage with counsel in exactly what's in the record. Right. And I welcome . . . I thought that I did that. I'm welcome . . . I'm not criticizing the answer you gave us, but you've got time left, and I'm just suggesting that it would help you to emphasize those facts if they're in the record. Yes. So the facts in the record show overwhelmingly . . . maybe I didn't mention disparate overtime as well . . . show disparate treatment of black employees compared to Indian and white, including the tape recording. The record is clear. So I have a hard time saying anything more than what I've said, and I can give time back other than to encourage honoring the jury's verdict. I do think what would have to be grappled with is whether or not there needs to be remediatory or not. There was already agreement that she should be going back for a new trial on some of the, or at least for summary judgment, and if this court agrees that there should be remand, is it going to be remanded with remediatory by this court, or back remand for remediatory for the judge, and any guidance? So I think there's . . . the briefing is adequate, and we would ask that the Court reverse and render judgment on the verdict. All right. Thank you, Mr. Sanford. Do you have time for a vote? Mr. Frazier? Good morning, Your Honors. May it please the Court, Shirley Frazier on behalf of Globe Networks, I believe. The Court can affirm the District Court's pre-verdict and post-judgment JMOL orders on three specific, distinct, and independent grounds. First, the evidence is legally insufficient to support the Section 1981 claims because the evidence is largely based on conclusory statements or subjective feelings without any supporting facts. Secondly, the plaintiffs failed to prove that all of the legitimate, nondiscriminatory actions or reasons that Globe took those actions were false. They have to prove that they are false or that the evidence is not worthy of credence, to use the language from the case law. And thirdly, and I think critically here, the evidence does not meet the strict but-for-causation test in Section 1981 cases. That is, if I may, but for the color of the employee's skin, Globe would not have committed the alleged adverse employment action. It's a but-for test. It's a strict but-for test. And to emphasize that, in Title VII cases, newer law, race just has to merely be a motivating factor. But in Section 1981 claims, race must be the decisive factor. That is critical. Those three reasons. Was the jury told that? Was the jury told that, about the but-for test? I believe that the instruction did lay out the causation, but it's just not there. They didn't show that all of these actions, they didn't really have any other exemplars, any other, they couldn't specify often, well, this individual, by name, who was either Indian or white, was treated differently. They could think of maybe a couple names, but they just didn't prove that these actions were intentional discrimination based on the color of their skin. I did give Mr. Sanford plenty of opportunity to give us specifics, and he didn't, and then I came back at the end and told him he had plenty of time to present more specifics, and he just referred to his brief. So I mean, I agree that it's a little bit hard to see where the evidence is that would support the verdict. Well, we agree, Your Honor, and the verdict was, I think, 48 pages long. I'm not, I wasn't allowed to present because it's not in the record, but I made a chart, and there, for each plaintiff, the jury was asked, for example, Matt Laughlin, the wrongful conduct was demotion, and the, but because of reporting discrimination. For instance, Michael Brown, he was laid off. That's the wrongful action in the, this is from the charge, and, but because of race. Let's look at Mr. Brown. Mr. Brown and Mr. Pringle, for example, they complained that they were laid off because of the color of their skin, but the evidence shows, and we have briefed it to the court, you can look on pages 33 to 35 of our brief, we go through these reasons. If you look at those pages, Your Honors, it says what these reasons were, but for Brown and Pringle, Your Honors, they survived two rounds of layoffs before they were laid off, and in those prior layoffs were included white employees. So the only claim for Brown and Mr. Pringle that went to the jury, they were laid off because of race, and the evidence, as the district court set out in its 85-page memorandum of opinion, went through each of that evidence, all that evidence, and this is just one example. And our brief, of course, says, sets that out, and so I won't go through that here in argument, but that's just an example of why these claims did not meet the stringent three-part test of Section 1981 claims. Now, what do you suppose the jury was thinking? I mean, that it is an exceptionally high verdict based on what we normally see, so there must have been something about the presentation that enraged this jury or upset the jury in some way. I don't know. I have a hard time seeing in the evidence, but what do you think might have happened that would have triggered this? We give great respect to the verdict, so what might have triggered it? What do you suspect? I suspect, Your Honor, and this is actually, perhaps to a lesser degree, indicative or characteristic of employment law cases, lose your employment. That's why a lot of those cases, frankly, go to the jury, because the jurors, they work. They should be working their adults. They understand that. Maybe they've been laid off. They get that work providing for your family is important, and so I think they naturally empathize for that. If you read in the record, and I think eight volumes of the trial testimony, each plaintiff went on and on about what was happening, and I think that perhaps got to the jury. Now, we do brief, as you see, in the second part or last part of our brief, as did the district judge find, that the jury's verdict was a result of passion and prejudice. The district court spent a lot of time on that, and we briefed that in the last sections of our brief, so I think it was a combination of identifying with losing their job or being demoted or maybe even being discriminated. I can't remember the composition of the jury, but they understand that, and the fact that a lot of this personal statements came in, but they didn't tie it to the color of their skin. They said this and this, and they assumed that we blacks were in the front room. Well, there were people of other races in the front room. The cameras were there for a lot of other reasons, and so I think they just got caught up in that and did this. Even Stephen, seven million for each plaintiff, I think they just decided that they all had suffered, and they gave them out. Again, that's my surmise. As you can see from the damages, they gave equal amounts to, I think, 10 different plaintiffs that were submitted who had disparate feelings, their treatment. They took things differently. But show, and I provided, we provided the court the bench exhibits, and what they are is, it's in the record, of course. That has to be in front of the record. It shows these policies that Glow had, and that each employee signed and acknowledged, and it has, in those documents, it says something like, when you take a break, you have to tell your manager and the field tech that you are. And so when they complained, well, we had to go tell Mr. Salat that when we took a break. Well, that's in the policy that they signed, and the reason is, and I think it's important for the court's decision, is knowing the nature of this work. Glow had a contract with Nokia, pretty big company. Nokia has a lot of cell towers, and I don't know, I just got a new phone about two years ago and looked at, oh, it's 5G. It's already 5G. Well, they're converting these towers from 4G to 5G. It's a year job. That's the contract. Do these in a year, and do all these towers. Well, as they went along, and the towers were checked off, there were fewer towers, and the work got funneled, it got narrow, and so they had to lay off or reassign because there was less work. But back to the breaks. Why did they have to tell their manager? Not because, and this was for all employees. Why? Well, they're dealing with a tech who may be 200 feet above the ground, changing from 4G to 5G in these towers that we all see around, and if he goes to take a break and the field guy hanging there needs something, this is a remote site and they're doing all the computer connections I don't understand, then he may need something, but if the employee here, these plaintiffs, were not at their desk, it could be a problem. That's why they had to tell their manager. Was there evidence, I'm not asking whether you agreed with the evidence, but was there evidence to the effect that the break policy was applied unevenly by race or ethnicity? The plaintiff, some of the plaintiffs discuss breaks, and they do claim that our breaks were restricted, and the breaks for the non-blacks, the Indians from India that are whites, they could take breaks more often. When asked, who could take more breaks? I mean, what is that? I mean, that's a conclusory. That's their evidence, and they couldn't identify, I think, one name. And did your client put on any evidence about the way in which the break policy was applied? Well, they did. They addressed the documents. It's tab two in the bench exhibits, and they went through that, and they applied all of those principles, all those policies equally. That's their position, and there were up to anywhere from 25 to 30 employees in this area, sometimes even more, and they went through the policies. It's in your sheet, and it requires them to notify everybody, managers, everybody had to notify the managers, and yes, they enforced that. And they stated both in the summary judgment evidence and both at trial the legitimate reasons, and they are non-discriminatory legitimate reasons. For instance, the breaks. They were never proven to be false or not worthy of credence. Now, they may say not worthy of credence because it's self-serving. Well, we're telling you, so you, plaintiff, the burden of persuasion remains with the plaintiff. And the McDonnell Douglas claim, I don't want to get into that, but Reeves says, and that's the case they claim, but Reeves says that when a plaintiff puts on the prima facie case, and then the employer presents evidence of legitimate reasons, then the burden is back on the plaintiff, and the presumptions and the framework of McDonnell Douglas, as the Supreme Court nicely says, goes away. And it's up to them to prove by preponderance of the evidence and the honors. They just simply did not do that. They have to prove that all of the legitimate reasons, and for each claim, so each plaintiff has to address his claim. So, for instance, Agassi terminated for reporting discrimination. He has to show that the cover of skin was the only reason that he was retaliated. And then Asheru terminated because of his race. Glow allowed Mr. Asheru to go to Africa just weeks before he started to tend to his ailing father. He was gone, I think, a couple of weeks, maybe more, and he came back. That is who Glow is. Who Glow is is in those argument exhibits that we provided that show the policy given to the employees, and these plaintiffs, each one, signed. And so that's the evidence. Those are the reasons. And, frankly, Your Honors, it's almost, I was thinking, is it really this simple? Well, it is, because the law says you have to prove. I'm sorry. All right. Thank you, Mr. Frazier. Mr. Clatter. No, Mr. Clatter. Mr. Clatter first. Yeah. Good morning, Your Honors. Dylan Clatter on behalf of the parent company slash support, which is sometimes referred to as CSS in this case. Here, the district court correctly found judgment as a matter of law, holding that no reasonable jury could find an integrated enterprise between the parent and the subsidiary in this case. There's no dispute here that the Fifth Amendment presumption that a parent corporation is not the employer of the subsidiary's employees, and that the plaintiff bears the burden to prove that the parent and the subsidiary are a single integrated enterprise to overcome that presumption. There is no dispute here that the four trivino factors govern this case, and there is no dispute that the most important trivino factor is the following. What entity made the final decisions regarding employment matters related to the person's claiming discrimination? There is no dispute that that is the most important factor. The district court hit that most important factor directly head on, based on, in part, a concession from plaintiff's counsel to read the district court's opinion, quote, Most importantly, there is no evidence that slash support had any involvement in or control over final employment decisions on matters involving the plaintiffs. In response to defendant's motion for judgment as a matter of law, plaintiffs admitted that they have no evidence that slash support made the decision to hire or terminate any of the plaintiffs. Witness testimony and other evidence admitted at trial support this conclusion. Glow, which is the subsidiary, hired plaintiffs. Glow terminated plaintiffs. Glow set plaintiff's terms and conditions of employment. And Glow made promotion and demotion decisions. That is the district court's finding. Did Ms. Cahoon, am I pronouncing that correctly? Did Ms. Cahoon testify that slash support installed senior executives at Glow's headquarters that were responsible for things like HR and operations? There was testimony that there was one parent employee at the Richardson, Texas location. There was absolutely no evidence that that employee had any involvement in the employment decisions in this case. As a result, that employee's stationment at the Richardson location is simply an ordinary aspect of the parent and subsidiary relationship. When pressed at oral argument, plaintiff's counsel told the district court, quote, so we do not have clearly any evidence that says an officer of slash support made the decision to terminate any of our employees or hire employees. And if that is ultimately the only factor and it turns on that factor, we do not have that. That is the plaintiff's concession to the district court, which, as the district court noted, was supported by the record. Glow's human resources employee testified at trial that they did not, quote, consult or have any communications with slash support about any of the decisions with respect to employment decisions related to the plaintiffs in this case. In fact, the trial court continued to press plaintiff's attorney at oral argument, asking plaintiff's attorney, quote, I just want to make sure there is no disagreement between the parties on some of what defense counsel mentioned about Glow has a separate tax ID number, that Glow is actually paying these employees, Glow is setting their work schedules and their terms of employment. Is there disagreement between the parties? Plaintiff's counsel, quote, no, there is no disagreement on that. What you will not find in the plaintiff's briefing is citation to any case in the Fifth Circuit or any of the district court cases that follow it, in which a plaintiff has conceded the most important tribunal factor is not present and yet still found in integrated enterprise. Instead, aspects like shared emails, one employee at the Richardson location, reporting lines, courts in the Fifth Circuit and the district courts following them have found that those are simply ordinary aspects of the parent and subsidiary relationship and not enough to satisfy the excessive influence or interference beyond such relationship required to find an integrated enterprise. And I think that can be best seen in the comparison of the cases that we have cited where in Trevino, which is the primary case that the Fifth Circuit actually overturned summary judgment, because there, there is evidence that it was common, common for the parent to control subsidiary layoffs, promotions and transfers and that there was over 100 documents signed by the parent's managers doing so. By contrast, in Lusk and Johnson, both Fifth Circuit cases where summary judgment was granted in favor of the plaintiff, there were common aspects of the parent-subsidiary relationship like common ownership, overlapping employees, lines of reporting, shared office space, but they could not override the lack of parent involvement in the sub's personnel decisions. I see that my time is up if you have any questions. Thank you, Mr. Clegg. Thank you. Mr. Sanford for rebuttal. So quickly with the integrated enterprise, the issue is whether or not if we don't have direct evidence on one factor, the primary factor, do all the other factors still count and can a jury still decide based on the other factors and even infer the most important factor? We say yes, they say no. But for is not only cause, it is a cause. Bostock says that and there's a case law, I believe it's Comcast, that says if you prove McDonnell Douglas, you prove Butt IV. So it's not a very high standard, but for me walking through this door, I wouldn't be here. Infinite number of Butt IVs. We have lots of evidence of discrimination. They group black workers under the cameras to surveil them more. Mr. Frazier made specific reference to what happened to Brown and Pringle, and he pointed out that they had survived two rounds of layoffs, and that, of course, is his suggestion. Excuse me, I'm still talking. That was his suggestion that that showed a lack of discrimination against, again, specifically Brown and Pringle. So there is no token conduct to promote discrimination. You don't ignore all the other discrimination because they were nice at some times. They still suffered the indignities during the employment, and no black person was rehired, failing Mr. Price. They only rehired people from India. Mr. Price, they rehired because he was from Compton, California, sending him back to Compton not to be an engineer like the other engineers, but when Indian engineers came in, they had him drive them around Compton as protection because he's a big black man. The discrimination was overwhelming. The jury saw that, and the reason why the verdict is what it is is because the jury saw the discrimination for what it was. It was an attack at dignity. Justice Kavanaugh, when he was talking about discrimination in Montreux, said, you know, discrimination is discrimination is discrimination. Any discrimination is an attack on you as a human being. The jury got that. That's why they gave it the same across the board. They were so proud to be Americans after that verdict. There was no bias. It was the right thing. If you need more, if you need more evidence, it's in the record. They were not allowed to take breaks as the others. They were scrutinized under the cameras more. They spoke to the black workers in condescending. The black workers passed around a petition saying there's discrimination, and that got quashed, saying if you do that, you're going to be fired. I don't know how there could be much more evidence than at this trial. It's in the record. All right. Thank you, Mr. Sanford. Your case and both of today's cases are under submission, and the court is in recess until nine o'clock tomorrow.